## MISSOURI-KANSAS-TEXAS RAILROAD COMPANY OF TEXAS v. RUTH ADELE McFERRIN

No. A-5348. Decided May 23, 1956.
Rehearing overruled July 25, 1956.
(291 S.W. 2d Series 931)

*Wayne R. Howell,* of St. Louis, Mo., *G. H. Penland,* of Dallas, *Naman, Howell & Boswell, C. Cullen Smith,* and *Hilton E. Howell,* all of Waco, for petitioner.

The trial court erred in entering judgment of plaintiff for the reason that the evidence showed that deceased McFerrin was guilty of contributory negligence; and there was no evidence to support the contention of plaintiff of discovered peril on the part of the railroad employees and deceased having been guilty of contributory negligence which was the proximate cause of the collision there could be no primary negligence on the part of defendant railroad. Texas & N.O.R.R. Co. v. Stewart, 248 S.W. 2d 177, error refused, n.r.e.; Dales v. Thompson, 162 S.W. 2d 156, no writ history; Dickson v. Texas & Pac. Ry. Co. 164 S.W. 2d 252, error refused W.O.M.

*Saulsbury, Skelton, Everton, Bowmer & Courtney* and *Byron Skelton,* all of Temple, for respondents.

In reply to petitioner's points cited Dommer v. Pennsylvania R. R. Co., 156 Fed. 2d 716; Stinett v. Gulf C. & S. F. Ry. Co. 38 S.W. 2d 615; Texas & N. O. Ry. Co. v. Grasoff, 191 S.W. 2d 1.

MR. JUSTICE CALVERT delivered the opinion of the Court.

This is a suit for damages for wrongful death brought against the petitioner Railroad by respondent, Ruth Adele Mc-Ferrin, for herself and as next friend for the minor children of herself and her deceased husband, R. T. McFerrin, who was killed in a crossing accident.

A jury trial on special issues resulted in a verdict in all respects favorable to respondent. Judgment for respondent was entered on the verdict. The Court of Civil Appeals has affirmed. 279 S.W. 2d 410.

Under petitioner's first point of error it is argued that its motion for an instructed verdict should have been granted because the deceased was violating Article 6701d, Sec. 86(d), Vernon's Annotated Texas Civil Statutes, at the time and place in question, and that this conduct on the part of the deceased was contributory negligence as a matter of law, which negligence, as a matter of law, was a proximate cause of the collision. The pertinent provisions of Article 6701d read as follows:

"Sec. 86. Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

\* \* \* \*

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

The point of error calls for an analysis of the statute which, in turn, poses many difficult problems. We note some of them in their logical order, as follows:

1. What duties are imposed by the statute?

2. Are the duties absolute or conditional?

3. If conditional, what are the conditions?

4. By what test shall the courts determine whether in a given case a train was "plainly visible" and "in hazardous proximity" to a crossing?

5. Does the evidence in the particular case establish conclusively the existence of the conditions giving rise to a duty to stop?

6. Does the evidence in the particular case establish conclusively a breach of the duty to stop?

7. Does breach of the duty to stop constitute negligence as a matter of law under the facts of the particular case?

In this opinion we will have occasion to discuss the first six questions listed, but because of the conclusion we reach in answering the sixth question, will have no occasion to consider or discuss the seventh.

This court has not had occasion to write in any case in which it was necessary to consider a defense to liability based upon a violation of the statute. Many of the Courts of Civil Appeals have. See Lackey v. Gulf, C. & S. F. Ry. Co., 225 S.W. 2d 630, no writ history, by the Austin Court; Lewis v. Thompson, 244 S.W. 2d 286, writ refused, N.R.E., by the Austin Court; Texas & N. O. R. Co. v. Stewart, 248 S.W. 2d 177, writ refused, N.R.E.,

by the Waco Court; Zamora v. Thompson, 250 S.W. 2d 626, writ refused, by the San Antonio Court; Larson v. Missouri-K-T R. Co., 254 S.W. 2d 215, writ refused, N.R.E., by the Austin Court; Panhandle & Santa Fe Railway Co. v. Karr, 257 S.W. 2d 486, affirmed, 153 Texas 25, 262 S.W. 2d 925, by the Amarillo Court; Gulf C. & S. F. R. Co. v. Pratt, 262 S.W. 2d 775, writ refused, N.R.E., by the San Antonio Court; Peters v. Chicago, R. I. & P. R. Co., 257 S.W. 2d 860, writ refused, N.R.E., by the Amarillo Court; Ft. Worth & D. Ry. Co. v. Barlow, 263 S.W. 2d 278, writ refused, N.R.E., by the Fort Worth Court; Texas Mexican R. Co. v. Bunn, 264 S.W. 2d 518, writ refused, N.R.E., by the San Antonio Court; Texas & P. R. Co. v. Midkiff, 275 S.W. 2d 841, application dismissed by agreement, by the Eastland Court; Texas & P. Ry. Co. v. Hasting, 282 S.W. 2d 758, writ refused, N.R.E., by the El Paso Court; Bollinger, v. Missouri-K-T R. R. Co, 285 S.W. 2d 300, writ refused, N.R.E., by the Waco Court. But in none of the cases listed did the court writing the opinion have occasion to make a searching analysis of the statute. Our research indicates that three other states—New Mexico, Utah and Indiana—have statutes which in all material respects are the same as our Article 6701d, Sec. 86, but only in Indiana has the statute been considered by the courts. See Dommer v. Pennsylvania R. Co., C.C.A., 7th Circuit, 156 Fed. 2d 716; Pearson v. Baltimore & O. R. Co., C.C.A., 7th Circuit, 200 Fed. 2d 569. Basing its holding upon the decision of the Supreme Court of Indiana in construing an analagous statute in Heiny v. Pennsylvania Ry. Co., 221 Ind. 367, 47 N.E. 2d 145, the United States Court of Appeals for the 7th Circuit held in the Dommer and Pearson cases, despite the statute, that the common law standard of the reasonably prudent man would be used in determining whether the conduct of the motorist was negligent.

■ As we analyze the statute it imposes two duties on a motorist approaching a grade crossing: (1) a duty to stop the vehicle within fifty but not less than fifteen feet from the nearest rail; and (2) a duty on one having thus stopped not to proceed until he can do so safely. The two duties cannot both be violated on the same occasion. The duty not to proceed comes into existence only if the duty to stop has been obeyed. The statute thus furnishes to a railroad-defendant two independent and alternative grounds of defense based on a violation by a motorist-plaintiff of the duties thereby imposed, and a defendant relying on a violation of the statute as a defense to liability should plead specifically which duty was violated by the plaintiff, or should plead violation of both duties in the alternative.

■ Further analyzing the statute, it appears obvious that the duties imposed on the motorist are not absolute but are conditional. Neither duty comes into existence unless and until these three conditions exist: (1) A train must be "approaching" the crossing; (2) the approaching train must be "plainly visible," and (3) the train must be "in hazardous proximity" to the crossing. Before either duty can be said to have been absolute in a particular case so as to form the basis of an instructed verdict all three conditions must be conclusively established by the evidence.

■ We are next confronted with the problem of deciding what test is to be used in determining whether, in a given case, an approaching train was "plainly visible" and "in hazardous proximity" to a crossing so as to give rise to the statutory duty to stop.

At the outset of this discussion it may be said that it is the position of petitioner that the fact of a collision establishes, conclusively, that the train was "in hazardous proximity" to the crossing and that the question may be examined into no further. In other words, it is the contention of petitioner, in effect, that the quoted provisions of Article 6701d operate as a rule of evidence and foreclose against the motorist the question of "hazardous proximity" in all crossing cases by mere proof of the happening of the collision. We apprehend that the statute was not intended to and does not lay down a rule of evidence; it prescribes rules of conduct and defines crimes. For penalties, see Article 6701d, Sec. 143. A simple example will serve to illustrate that the contention of petitioner is unsound. If a motorist traveling at a speed of 30 miles per hour, or 44 feet per second, reached the statutory stopping distance of 50 feet at a time when an approaching train, then becoming plainly visible and traveling at 60 miles per hour, or 88 feet per second, was a quarter of a mile (1320 feet) from the crossing, the motorist, by continuing his rate of speed, would normally be across the track more than 13 seconds before the train reached the crossing. It is hardly likely that any court would say, as a matter of law, that in failing to stop the motorist had violated the statute or the duty of care imposed on him by the statute. Yet if the motorist's automobile should stall as he attempted to cross the track and he was hit by the train, petitioner's theory would compel the court to deny a recovery of damages on the ground that the collision established, as a matter of law, that the train was in "hazardous proximity" to the crossing. We reject the theory and hold that whether a

train was "in hazardous proximity" to a crossing, so as to impose on an approaching motorist a duty to stop, must be determined by the court from the evidence of the facts and circumstances existing at the time the motorist was compelled to make a decision, and should not be determined by or from the happening of subsequent events. We would be loath, indeed, to hold that the legislature, by the enactment of Article 6701d. Sec. 86(d), laid down a rule of evidence by which in this situation it has exacted of the motorist perfect foresight of all eventualities. While we reject petitioner's theory of the law, we recognize that in a great many cases involving crossing collisions, and perhaps even in a majority of such cases, the evidence will undoubtedly show conclusively that the train was "in hazardous proximity" to the crossing as the motorist approached it, and the critical issue, therefore, will usually be as to when, if at all, the train became "plainly visible."

■ If there is a duty on the motorist to act it arises as he approaches and comes within the statutory stopping area. It is at that time that he must determine whether he is under a statutory duty to stop. As heretofore pointed out, the existence of the duty is not absolute but is conditioned on the existence at that time of a certain state of facts. It seems to us that in determining whether the fact situation is such as to call the statutory duty into existence, we should not hold the motorist to greater wisdom or better judgment than a reasonably prudent person, similarly situated, would exercise. Accordingly, we apply the objective common-law test of the reasonably prudent man and hold that before it can be said in a given case that an approaching train was "plainly visible" as a matter of law, it must appear, as a matter law that a reasonably prudent person, situated as was the motorist and exercising ordinary care for his own safety, should have seen it. We further hold that it will not be said that a train was "in hazardous proximity" to a crossing, as a matter of law, unless under all the attendant facts and circumstances it can be said, as a matter of law, that by reason of the speed and nearness of the train a reasonably prudent person should have known that an attempt to proceed over the crossing ahead of the train, was hazardous.

Intensive and extensive research has failed to discover any case squarely in point, either in this or in any other jurisdiction, other than the Indiana case of Pearson v. Baltimore & O. Ry. Co., supra. There are cases from other jurisdictions which are interestingly analogous. They support the conclusion we have announced. See Gendron v. Glidden, 84 N.H. 162, 148 Atl.

461; Baker v. Salvation Army, Inc., 91 N.H. 1, 12 Atl. 2d 514; Smith v. Clark, 187 Va. 181, 46 S.E. 2d 21; Wilkinson v. Marcellus, 51 Cal. App. 630, 125 Pac. 584.

A New Hampshire statute involved in Gendron v. Glidden provided that a motorist approaching an intersection should grant the right of way to vehicles approaching from his right *if* the vehicles "were arriving at the intersection at approximately the same instant." Pub. Laws 1926, C. 90, Sec. 3. The statutory duty to yield the right of way was thus made conditional on the existence of a certain factual situation. It was the contention of the defendant, who was approaching an intersection from the plaintiff's right, that the plaintiff was guilty of contributory negligence, as a matter of law, in that he violated the statute by failing to yield the right of way. To decide that question it was necessary that the Supreme Court of New Hampshire adopt a test for deciding whether the statutory duty to yield the right of way ever came into existence. The court might have held that it would decide whether the objective facts in evidence showed conclusively that the parties were arriving at the intersection at approximately the same instant. It did not do so, however, but with respect to this question said:

"The statute does not give the party upon the right an absolute right of way. Nor does it fix an inflexible standard by which the rights of the parties to a collision at street intersections may be determined, as a matter of law, under all circumstances. It does not require the driver of a vehicle approaching an intersection to await the passage of every car which may be approaching from his right irrespective of its distance from the intersection, its speed, and the probable conduct of its driver. It lays down a rule of conduct which in its very nature is relative to, and dependent upon, the factors making for danger. The statute imposes a duty upon the party approaching from the left to yield the right of way only if, in view of all factors affecting safety, there is a reasonable apprehension of danger of a collision if he should proceed to cross the intersection ahead of the opposing car. *In making his observation of the factors making for such danger, and in reaching his conclusion whether he can pass in safety, he is bound to use the care of an ordinarily prudent man. It is not the exact or mathematical situation, but the apparent situation, obvious to a man of ordinary prudence reasonably observant, that must control his judgment and determine the right of precedence. * * **

*"In short, the invocation of the statute raises an issue of fact in the first instance, namely, whether or not a man of reasonable prudence in the position of the person approaching from the disfavored direction would reasonably have concluded that he could pass the intersection without danger of collision.* If the finding on this issue is in the negative, the rule applies; otherwise not. * * *." [84 N.H. 162-167], 148 Atl. 465. (Emphasis ours).

The Virginia statute involved in Smith v. Clark provided that a motorist intending to stop, start or change his course, should "first see that such movement can be made in safety." Code 1936, Sec. 2154 (122) (a). There was thus a duty not to change course except upon the existence of a given factual situation. The evidence disclosed that the defendant was in the process of making a left turn across the path of plaintiff's approaching automobile when the collision occurred. The trial court instructed the jury that the law required the defendant, before turning, to see that the left turn could be made in safety. The Supreme Court of Virginia held the instruction to be erroneous. It did not hold that the negligent or non-negligent quality of the defendant's conduct was to be tested by the court's evaluation of the objective facts, or even by the subjective evaluation of the situation by the plaintiff, but quoted from its former opinion in Virginia Electric & Power Co. v. Holland, 184 Va. 893, 37 S.E. 2d 40, 43, as follows:

" 'We measure the words, "made in safety" used in the statute and used in instruction No. 7, by the rule of reason and the ordinary rule of human conduct under existing conditions. Seeing that a movement can be "made in safety" does not mean that a driver of an automobile must wait at a crossing which is controlled by a traffic light for all street cars to pass, even though they may be a sufficient distance away which, under ordinary conditions, taking into consideration all the attendant circumstances, would not render it unsafe to go across the tracks. There would appear to be no other rule to guide the operator of an automobile under these conditions than the one of ordinary care.

" 'From the argument of counsel for the defendant it appears that he gives to the statutory words, "made in safety," the meaning that a movement can only be made when it can be done free from all possibility of danger. If movements in traffic could be made only when there were no possibility of danger, traffic would have great difficulty in moving at all.' "

The court then continued:

"This court has therefore interpreted this language, 'first see that such movement can be made in safety', to mean that it is incumbent upon the driver to use reasonable and ordinary care under the circumstances to see that such movement can be made safely." 187 Va. 181, 46 S.E. 2d 25.

More persuasive, perhaps, than the New Hampshire and Virginia cases just analyzed are the Indiana cases heretofore mentioned and cited.

In Heiny v. Pennsylvania R. Co., 221 Ind. 367, 47 N.E. 2d 145, 147, the Supreme Court of Indiana had under consideration the claim that the deceased motorist was guilty of contributory negligence as a matter of law in violating a statute making it unlawful, when transporting explosives, etc., to drive upon a railroad track "unless such person shall first bring such vehicle to a full stop, and shall ascertain definitely that no train, car or engine is approaching such crossing and is in such close proximity thereto as to create a hazard or danger of a collision." In rejecting the claim the court said: "Under a strict interpretation of the act, the operator of such a vehicle is, in effect, an insurer of his own safety. * * * It will not be presumed that the decedent was guilty of contributory negligence merely because there was a collision between his truck and the locomotive."

In Dommer v. Pennsylvania R. Co., 156 Fed. 2d 716, 719, the defendant railroad contended that the motorist was guilty of contributory negligence as a matter of law in the violation of the Indiana counterpart of our Art. 6701d, Sec. 86(d), in that having stopped in obedience to the statute, he proceeded when he could not do so safely. The trial court charged the jury that " 'in ascertaining whether Mr. Dommer could have proceeded safely onto and across the tracks under the circumstances as shown by the evidence, he was charged with the duty of exercising the reasonable care which an ordinarily prudent person would have exercised under the same or similar circumstances. * * *.' " The defendant was critical of the charge because it did not impose on the motorist the mandatory duty of the statute not to proceed until he could do so safely. The United States Court of Appeals stated it did not believe "the defendant's contention in this respect is realistic," and continued: "If followed to a logical conclusion, it would mean that the very occurrence of a collision, under the circumstances as

shown by this record, would constitute contributory negligence as a matter of law."

In Pearson v. Baltimore & O. R. Co., 200 F. 2d 569, 574, the United States Court of Appeals had before it the exact statutory provision before us in this case. With respect to the duty of the motorist to stop in obedience to the statute, the trial court instructed the jury as follows:

" 'If you find from all the evidence in this case that at the time and place in question Defendant's train was plainly visible to Plaintiff and was in hazardous proximity to such crossing, then I instruct you that she likewise had a duty to stop. *In determining whether or not the Defendant's train was plainly visible, however, you must determine whether it was plainly visible to a person exercising reasonable care under all the facts and circumstances, as shown by the evidence, including whether or not the Defendant's automatic signal was in operation or not.'* "

The defendants contended that the trial court had improperly qualified the statute by instructing the jury that whether the train was plainly visible must be determined by the standard of the reasonably prudent person. The contention was rejected by the court. It was the same contention that is made in the concurring opinion in this case.

Section 86 is but one of 156 sections contained in a comprehensive Act of the 50th Legislature, passed in 1947, regulating traffic on highways. Acts 1947, 50th Leg., p. 967, ch. 421. (Art. 6701d, V.A.T.C.S.). The historical note to Article 6701d, contained in Vernon's Annotated Texas Statutes, states that it is similar to the Uniform Act regulating traffic on highways but that it contains many additions and differences. A cursory glance through its many sections will show that it embraces the re-enactment of many then existing statutes, the enactment of many entirely new statutory regulations, and the transposition into statutes of many common-law rules of conduct. As examples of the last classification, see Secs. 54(a) and 61(a) and the latter part of Sec. 83.

We know of no reason for saying that the purpose of the legislature in including Sec. 86 as a part of such a comprehensive law was to give the railroads some advantage in crossing cases which they did not enjoy at common law, or was to change the common-law test of negligent conduct on the part of a

motorist. Sec. 86 of the Texas Statute is in the exact language of the Indiana statute, except that the Texas statute provides that the stop must be made not less than *15* feet from the nearest *rail,* whereas the Indiana statute provides that the stop shall be made not less than *10* feet from the nearest *track.* Indiana was the only state having a statutory provision such as Sec. 86 when the Texas statute was enacted, and it is not a violent assumption, therefore, that the Texas statute must have been patterned after the Indiana statute. Neither is it a violent assumption that those sponsoring the adoption of the Indiana statute must have known of the construction given that statute in Dommer v. Pennsylvania R. Co., supra, decided in 1946.

■ Considered by and large, we see no sound reason to be dissuaded from applying the common-law test of the reasonably prudent man in determining whether, under the statute, a train was "plainly visible" and "in hazardous proximity" to a crossing. That holding does not render the statute nugatory or futile. The transposition of this and other common law rules of conduct into statutory rules makes their violation, if unexcused, negligence per se, and subjects one who violates them to criminal penalties not theretofore imposed.

Since the writing of this opinion the case of Port Terminal Railroad Ass'n. v. Noland, 288 S.W. 2d 276, by the Galveston Court of Civil Appeals, has come to our attention. The court, in that case, used the reasonable prudent man test in determining whether the train was "plainly visible."

■ We come now to consider the record in the present case in the light of the rules we have laid down.

The statutory defense interposed by petitioner in this case through its pleading and its motion for an instructed verdict was that the deceased failed to stop. It did not defend on the ground that the deceased stopped but thereafter undertook to proceed when he could not do so safely. With the issues thus narrowed by the pleadings, petitioner's motion for an instructed verdict was good only if the evidence conclusively established the three conditions giving rise to the duty to stop and conclusively established a failure to stop.

It is undisputed that the train was "approaching," and the first condition is therefore conclusively established. The next question, then, is this: does the evidence show conclusively that the approaching train was "plainly visible" and "in hazardous

proximity" to the crossing within the meaning of the statute so as to impose on the deceased a duty to stop?

■ The evidence is that the deceased was driving his automobile north on a graveled road which paralleled the railroad track, on the west, for some 600 feet before making a curve to the right and crossing the track at right angles. The train was traveling in the same direction. The fireman testified that he saw the automobile when it entered the graveled road and continued to see it at intervals until the collision; that the train was traveling at a speed of from 55 to 60 miles per hour and the automobile at a speed estimated at 18 miles per hour; that the automobile "slowed down" to make the curve toward the crossing, but then "drove steadily right on" until it was on the track. The fireman declined to estimate the distance of the train from the crossing at the time the automobile entered the road paralleling the track, but inasmuch as his speed estimates were that the train was traveling approximately three and one-third times as fast as the automobile and the automobile at that point was approximtaely 675 feet from the crossing, the train must have been approximately 2250 feet from the crossing. Thus it appears from petitioner's own testimony that the train was considerably to the rear of the automobile at all times while traveling in the same direction toward the crossing. It is to be remembered that the deceased was on the left side of the front seat of his car and the train was approaching from the rear and on the right side of the automobile. The only way the deceased could have seen the train at all, while traveling north, was by turning to look to his rear and it is not at all clear in this record that the train could have been seen even then. We cannot hold, as a matter of law, that a train is "plainly visible," within the meaning of the statute, if an approaching motorist has no warning of the approach of the train and must look to his rear in order to discover its presence.

■ There is in the record expert testimony from a surveyor which clearly tends to establish that after the deceased made his turn toward the track and at all times after he came within fifty feet thereof he could have seen the train if he had looked to his right. Ordinary care for his own safety required that he look to his right before passing through the stopping zone. We therefore hold, as a matter of law, that the train was "plainly visible" when the deceased entered, or at least while he was within the statutory stopping area. There is no evidence that it was "plainly visible" at any greater distance than fifty feet from the track. There is no direct evidence of the distance

of the train from the crossing at the time the deceased came within fifty feet thereof, but testimony as to the respective speeds of the automobile and the train establishes, rather clearly we think, that at such time the train must have been within 200 to 300 feet of the crossing. We hold, as a matter of law, under the facts and circumstances of this case, that a reasonably prudent person, situated as was the deceased, should have known that an attempt to proceed over the crossing ahead of the train, was hazardous. We accordingly hold, as a matter of law, that at the time the train became "plainly visible" it was "in hazardous proximity" to the crossing.

■ We cannot hold, however, that the evidence is conclusive that the deceased failed to stop as required by the statute. In this connection it may be noted that in answer to two special issues the jury found that the deceased did not fail to stop within fifty and not less than fifteen feet of the nearest rail, and did not fail to stop after the train became plainly visible and in hazardous proximity to the crossing.

The burden was not on the respondent to prove that the deceased stopped; it was on petitioner to prove, as a necessary part of its statutory defense, that the deceased failed to stop. The only eye-witness to the events immediately preceding and surrounding the collision was petitioner's fireman. He testified that the deceased did not stop before going on the crossing.

The fireman was an interested witness. City of Waco v. Branch, Tex. Civ. App., 8 S.W. 2d 271, 274, writ refused; Flack v. First Nat. Bank of Dalhart, 148 Texas 495, 226 S.W. 2d 628, 633. As to the effect to be given to the testimony of an interested witness we quote from McGuire v. City of Dallas, 141 Texas 170, 170 S.W. 2d 722, 728:

"* * * The general rule is that evidence given by an interested witness, even though uncontradicted presents an issue to be determined by the jury. Mills v. Mills, Tex. Com. App., 228 S.W. 919; Id., 111 Texas 265, 231 S.W. 697. But this rule is not without exception. Where the testimony of an interested witness is uncontradicted, is clear and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony, conclusive effect may be given thereto. Trinity Gravel Co. v. Cranke, Tex. Com App., 282 S.W. 798, loc. cit. 801. American Surety Co. v. Whitehead, Tex. Com. App., 45 S.W. 2d 958, loc. cit. 961. The applicable rule is further strengthened where the testimony of the interested witness is, as in this

case, corroborated by other witnesses and the opposite party had the means and opportunity of disproving the testimony, if it were not true, and failed to do so. Simonds v. Stanolind Oil & Gas Co., 134 Texas 332, 350, 114 S.W. 2d 226, 136 S.W. 2d 207."

In this case the fireman's testimony is not strengthened by the opportunity to, but failure of, respondent to impeach him. He was the only eyewitness. Moreover, the record is not devoid of evidence casting doubt and suspicion on his testimony. There is testimony that after the collision the automobile was found to be in second gear. This testimony may not have been sufficient to sustain a finding that deceased did stop his automobile, a matter we are not called upon to decide. It is sufficient to cast doubt on the testimony of the fireman, particularly when coupled with the presumption that deceased obeyed the law. Flack v. First Nat. Bank of Dalhart, supra. We hold that the uncorroborated testimony of the fireman did not require the giving of an instructed verdict.

■ Petitioner's Second Point is as follows: "The Trial Court erred in overruling the Petitioner's Motions for Judgment and entering judgment for the Respondents, for the reason that under the evidence the deceased, R. T. McFerrin, was guilty of contributory negligence proximately causing the accident, as a matter of law, in that he failed to conform to the standard of conduct required of him as measured by the test of the reasonably prudent man, and the Court of Civil Appeals erred in failing to so hold."

It will be noted that the point speaks only of general contributory negligence in that the plaintiff "failed to conform to the standard of conduct required of him as measured by the test of the reasonably prudent man." It does not assert contributory negligence in terms of any specific act or omission. An examination of the petitioner's "Statement" and "Argument and Authorities" under the point fails to disclose the particular act or omission of deceased alleged to constitute contributory negligence as a matter of law. The argument itself is vague and suggests that the evidence "would compel a finding that the deceased was guilty of contributory negligence, having violated the well recognized prudent man rule." We could say that the point itself and the statement and argument thereunder are broad enough to support a claim that the deceased was guilty of contributory negligence, as a matter of law, in failing to keep a proper lookout, in failing to stop before going upon the track,

or in proceeding, after having stopped, when he could not do so safely, or in all of such acts or omissions. But the law does not impose upon this Court the onerous duty of discovering from the evidence all the negligent acts and omissions of which a party may have been guilty. That duty rests upon counsel. Rule 418, Texas Rules of Civil Procedure, provides that a point of error is sufficient if it directs the attention of the court to the error relied upon. The Rule refers to the *particular* error relied upon. This point is insufficient to direct our attention to any particular act or omission which petitioner believes to have been contributory negligence as a matter of law, and it is accordingly overruled.

One of the most difficult questions in the case is raised by petitioner's Points Ten, Twelve and Thirteen.

Mrs. McFerrin testified, over the objection of petitioner, that on occasions when she was in the car with him her husband never crossed the crossing in question without first stopping the car and looking and listening for trains. The objection was that what the deceased did on other occasions or what his habit and custom was with respect to stopping before proceeding over the crossing would not be evidence as to whether he stopped on this particular occasion. The question briefed here is whether evidence of habit and custom is admissible to prove care or negligence on a particular occasion. The sufficiency of the predicate laid for the testimony of habit is not questioned.

On the question presented the decided cases in this state, like those in some of the other states, are conflicting. For cases holding such testimony to be inadmissible, see Houston & T. C. R. Co. v. Jones, 16 Texas Civ. App. 179, 40 S.W. 745, no writ history; Gulf C. & S. F. Ry. Co. v. Hamilton, 17 Texas Civ. App. 76, 42 S.W. 358, 360, no writ history; Missouri K. & T. R. Co. v. Johnson, 92 Texas, 380, 48 S.W. 568, 5 Am. Neg. Rep. 473; International & G. N. Ry. Co. v. Ives, 31 Texas Civ. App. 272, 71 S.W. 772, 774, writ refused; Stewart v. Galveston H. & S. A. Ry. Co., 34 Texas Civ. App. 370, 78 S.W. 979, writ refused; Texas & Pac. Ry. Co. v. Frank, 40 Texas Civ. App. 86, 88 S.W. 383, no writ history. For cases holding it to be admissible, see International & G. N. R. Co. v. Kuehn, 2 Texas Civ. App. 210, 21 S.W. 58, 62, no writ history; Gulf C. & S. F. Ry. Co. v. Anson, Texas Civ. App., 82 S.W. 785, 786, no writ history; McKerley v. Red River, T. & S. Ry. Co., 85 S.W. 499, writ dismissed; Gulf C. & S. F. Ry. Co. v. Dooley, 62 Texas Civ. App. 345, 131 S.W. 831, no writ history; Southern Traction Co. v.

Kirksey, Texas Civ. App., 222 S.W. 702, 704, no writ history. It is to be noted that Missouri K. & T. Ry. Co. v. Johnson is the only one of the cited cases decided by this Court, and McCormick & Ray state in their book, Texas Law of Evidence. Sec. 686, p. 883, that what was said in that case with respect to the lack of probative force in habit evidence, was dicta. It may be noted also that the Johnson case was not even noticed in the Anson and McKerley cases, later cases in point of time. All in all, considering the state of the decided cases, it can probably be said that the question is yet an open one in this state.

With respect to the state of the decided cases in other jurisdictions, the following definite statements, as drawn from the authorities listed, may be made. 1. Where there are eyewitnesses to the accident, the overwhelming weight of authority is that evidence of habit or custom of care of negligence is not admissible. 2. Where there is no eyewitness to the accident, the weight of authority is that evidence of habit or custom is admissible. 3. In a few jurisdictions habit and custom evidence is admitted in all cases, even those in which there is an eyewitness to the accident, and in a few it is not admitted in any case, even those in which there is no eyewitness. 20 Am. Jur., Evidence, Secs. 332, 333, p. 310; 38 Am. Jur., Negligence, Secs. 320, 321, p. 1017; Blashfield's Cyclopedia of Automobile Law and Practice, Sec. 6190, Vol. 9c, p. 296, et seq.; Jones' Commentaries on Evidence, Secs. 687-689, Vol. 2, p. 1279, et seq.; 1 Greanleaf on Evidence, 16th Ed. Sec. 14j, p. 53; 4 Chamberlayne, The Modern Law of Evidence, Secs. 3195-3198, p. 4430, et seq.; Annotation, 15 A.L.R. 125, et seq.; Annotation, 18 A.L.R. 1106. In the few cases in which the question has been considered, it is held that the fact that the only witness may be an employee of the opposite party or that his veracity is under attack does not let in habit or custom evidence. Petro v. Hines, 299 Ill. 236, 132 N.E. 462, 18 A.L.R. 1106; Gillette Motor Transport, Inc. v. Kirby, 208 Okla. 68, 253 Pac. 2139, 7 Okla. Law Rev. 102.

■ With the exception of the writer and Associate Justice Smith, all members of the Court are in agreement that this Court should adopt and follow the majority rule that habit evidence should not be admitted where there is an eyewitness to the accident, even though the eyewitness be an employee of the opposite party. What is now to be said on the subject is said in support of the writer's position that such evidence has probative force and therefore should be admitted under circumstances to be noted.

Habit evidence to prove care or negligence is not usually excluded because wholly lacking in probative value, but for reasons such as those given by the court in Zucker v. Whitridge, 205 N.Y. 50, 98 N.E. 209, 213, 41, L.R.A. N.S. 683, where it is said:

"* * * A question of evidence, to some extent, is a question of sound policy in the administration of the law. Sometimes it is necessary to weigh the probative force of evidence offered, compare it with the practical inconvenience of enforcing a rule to admit it, and decide whether, as a matter of good policy, it should be admitted. Uniform conduct under the same circumstances on many prior occasions may be relevant as tending somewhat to show like conduct under like circumstances on the occasion in question. All relevant evidence, however, is not competent. * * * So, assuming the evidence in question to be relevant, I think it should be held incompetent under the circumstances, because its probative force does not outweigh the inconvenience of a multitude of collateral issues, not suggested by the pleadings, the trial of which would take much time, tend to create confusion and do little good. * * * Habit is an inference from many acts, each of which presents an issue to be tried, and necessarily involves direct, and naturally invites cross examination. The circumstances surrounding each act present another issue, and thus many collateral issues would be involved which would not only consume much time, but would tend to distract the jury and lead them away from the main issue to be decided. From the want of previous notice, the other party would not be prepared to meet such evidence; and after all the testimony of this character was in the fact would remain that, as no one is always careful, the subject of inquiry, although careful on many occasions, might have been careless on the occasion in question."

Wigmore suggests that "There is no reason why such a habit should not be used as evidential, —either a habit of negligent action or a habit of careful action," and states that "such evidence often is of probative value and is not attended by the inconveniences of character evidence." 1 Wigmore on Evidence, Third Edition, § 97, pp. 530 and 532.

The American Law Institute's Model Code of Evidence has not been adopted in this state and of course does not control our decisions. On the other hand, the Model Code was prepared by and with the advice of many of this country's outstanding lawyers, judges and teachers in the field of evidence, and the rules

suggested in the Model Code are entitled to serious consideration in deciding any evidence question which is still open in this state. By Rule 307(2) of the Model Code it is stated: "Evidence of a habit of a person is admissible as tending to prove that his behavior on a specified occasion conformed to the habit." It is then suggested, by way of example, that if in an action for the wrongful death of X at a railway crossing "W offers to testify for P that he had on numerous occasions been with X when X crossed the track in question and that on such occasions X had stopped and looked in both directions before entering the crossing" the testimony should be admitted; whereas, if the offer is that each of ten witnesses will testify that he was with X on one separate occasion and that on that occasion X stopped and looked in both direction before entering the crossing, the testimony should be excluded. No doubt the basis of the distinction is that in the first example the probative value of the evidence is thought to outweigh the slight inconvenience that would be caused by the examination and cross-examination of one witness on a somewhat collateral matter, while in the second example the inconvenience to the court of examining and cross-examining ten witnesses as to ten different incidents would outweigh the value of the evidence.

If it be conceded that habit evidence has any probative value (and most courts concede that it has) and it can be obtained from one witness, it is my opinion that it should be admitted even though there was an eyewitness to the accident.

All members of the Court, including the writer, are of the opinion that a fair evaluation of the record establishes that petitioner's objection to the evidence and its motion to strike were adequate to preserve the point. All members are also of the opinion that petitioner did not waive the error by cross-examination of Mrs. McFerrin on the same matter, Dallas Ry. & Term. Co. v. Bailey, 151 Texas 359, 250 S.W. 2d 379, 382, and cases there cited. All members are further of the opinion that this testimony was " 'reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case' " requiring a reversal of the judgment under Rules 434 and 503, Texas Rules of Civil Procedure, unless jury findings, favorable to respondent, on the issues of discovered peril, rendered the error immaterial and harmless.

The habit testimony given by respondent bore weightily on issues of contributory negligence. In answer to those issues the jury found the deceased did not fail to stop. The fireman testi-

fied positively that the deceased failed to stop. The only contrary evidence was the finding of the automobile in second gear after the collision and the habit testimony. It is our considered judgment that if the habit testimony had been excluded the jury very probably would have found that the deceased did fail to stop, thus convicting deceased of contributory negligence. On the other hand, if the jury findings in response to the issues of discovered peril are permitted to stand, the judgment for respondent is a proper judgment even if we assume that with the habit evidence excluded the jury would have convicted deceased of contributory negligence.

■ Petitioner's third point asserts that there is no evidence of probative value to support the jury's answers to some of the discovered peril issues. Specifically, it asserts that there is no evidence to support the essential finding that petitioner's fireman discovered the perilous position of the deceased in time to prevent the collision. We sustain this point and therefore necessarily hold that the discovered peril findings cannot render harmless the error in admitting the habit evidence.

The only testimony shedding any light on the perilous position of the deceased just prior to the collision and the discovery of that position by the fireman, is the testimony of the fireman himself. A fair summary of the testimony of the fireman is as follows: he watched the deceased driving north along the graveled road at a speed of approximately eighteen miles per hour; he saw deceased slow down to make the right turn toward the crossing and he "just knew he was going to stop. My mind was clear. But he didn't stop. He just gradually come right on; it looked for a while we were going to beat him there, he was going so slow;" when he saw deceased "coming right up on the track" he knew "that unless something happened the train and car were going to hit;" when the deceased didn't stop it was apparent "that something was going to happen," but "we were right on him at the time." He refused to estimate the distance of the train from the crossing at the time he realized that the deceased was in peril but stated that when he realized the deceased was not going to stop he called for the emergency brakes.

There is in the foregoing summary no evidence, direct or circumstantial, that the fireman realized the peril of the deceased in time that by the exercise of ordinary care in the use of the means at his command he could have avoided the collision. The facts in this case are obviously different from the facts

in Ford v. Panhandle & Santa Fe Ry. Co., 151 Texas 538, 252 S.W. 2d 561, on which respondent relies to sustain her verdict. In the Ford case the testimony was that the train was traveling at a speed of from 10 to 15 miles per hour and the fireman gave positive testimony that he realized the peril of the motorist when the train was 100 feet from the crossing. On the face of this testimony it appeared that from the time of realization of peril the operatives of the train had a minimum of four seconds to react and apply the brakes, thereby slowing the speed of the train to some extent before reaching the crossing. In the instant case the testimony is that the train was traveling at a speed of from 55 to 60 miles per hour and there is no evidence of the distance of the train from the crossing when the fireman realized the peril of the deceased. The train "was right on him." The jury did not have to accept this opinion or estimate of the fireman, Ford v. Panhandle & Santa Fe Ry. Co., supra, but rejecting it would have left no evidence whatever as to the time of discovery. With the burden of proof on these issues on the respondent, she simply failed to meet the burden required of her and there is no evidence to support the verdict on these issues.

It follows from what has been said that the judgments of the courts below must be reversed and the cause remanded for retrial.

In view of the likelihood of another trial we will consider, briefly, one other matter that may arise on such a trial.

■ Point Eight complains because the trial court refused to charge the jury, in connection with the damage issue, that any recovery awarded to respondents would not be subject to payment of income tax. We do not think such a charge should be given. It introduces a wholly collateral matter into the damage issue. In so far as Texas & N. O. R. Co. v. Pool, Texas Civ. App., 263 S.W. 2d 582, no writ history, may be in conflict with what is here said, it is disapproved. The other matters complained of may not occur on another trial.

All costs are adjudged against respondent.

The writer and Associate Justice Smith dissent from the judgment. We do not agree that the admission of the habit evidence was error and we find no other reversible error in the record. We accordingly believe the judgment of the courts below should be affirmed.

Opinion delivered May 23, 1956.

Associate Justice Wilson not participating.

MR. JUSTICE GARWOOD joined by JUSTICE CULVER concurring.

I agree with all the conclusions of the court except that which defines the statutory phrases, "plainly visible" and "in hazardous proximity" in terms of whether a person in the position of the plaintiff motorist would, in the exercise of reasonable care, have seen the train and appreciated its presence to be a hazard.

The statute says that the motorist must stop when an approaching train is plainly visible and in hazardous proximity. We say that the motorist must stop when in the exercise of reasonable care under the circumstances he should have seen the train and considered it to be a hazard.

Now obviously, as a matter of common law and common sense, if a motorist is on a collision course with a train which he reasonably ought to see and consider a hazard, he ought to stop. There is not, nor ever was, need of an act of the Legislature to establish or settle that simple fact. But what we say the statute means is just that: when a motorist obviously ought to stop, he must stop. I find it difficult to imagine a Legislature, and one composed largely of lawyers, making such a futile enactment, and then stating, as it does, in the emergency clause of the act that existing rules of the road are so outmoded as urgently to require change. The specification of the stopping area would not of itself render an otherwise futile enactment worth-while.

Of course, if an act or provision as written is confusing in actual practice or ambiguous within itself, and if courts are confronted with applying it, they have to do the best they can with it even to the point of adding considerable language to what the Legislature wrote. But I fail to see how the instant provision, as written, falls within that category.

The phrases "plainly visible" and "in hazardous proximity" seem to be rather ordinary ones that most people of average intelligence will understand wholly without reference to whether th particular motorist under all the circumstances should in the exercise of reasonable care have seen the train and appreciated the hazard. One will find every one of the words in question

defined in the dictionaries without reference whatsoever to the negligence or due care of persons under the circumstances.

If one hears in conversation or reads in a book that "the moon was plainly visible" or that "the falling aircraft was in hazardous proximity to the earth," he has a quite clear idea of what is meant, without speculating about whether someone kept a "proper lookout" for the moon or, in the exercise of due care under the circumstances, would have appreciated that the aircraft was in danger of crashing.

Nor does the fact that these expressions are found in a statutory rule of conduct change their ordinary meaning. The law is full of more or less absolute rules and yet we have no great difficulty in applying them without changing their ordinary meaning in the manner which we now employ.

If the statute says the motorist shall stop when faced by a red traffic light, we do not feel required to define "faced by a red traffic light," still less to define it in terms of due care of the motorist under the circumstances. Such a standard is in a proper sense to be called a subjective one because, while involving also the standard of the hypothetical "reasonable man" it is actually applied to the particular motorist by reason of bringing in the circumstances of the particular case.

If the case presents special circumstances such as that, by reason of the presence of certain green lights put there by a a prankster alongside the red light, the motorist became confused, we would consider these circumstances by way of justification or excuse for the actual violation of the statutory injunction. We would not say that under the properly construed terms of the statute, the motorist was *not* faced with a red traffic light.

There is an important practical difference between the two approaches. When the motorist has failed to stop, which is usually the case in railroad crossing collisions, and his duty to stop under the statute has been established, it will usually be harder for him to justify his failure to stop than it would be for him to negative his duty to stop under the Court's test for "plainly visible" and "in hazardous proximity."

Under the more or less literal acceptance of the statute for which I contend, if the physical facts show, for example, a clear day with no impediment to vision between the train and

the automobile when the latter is at fifty feet or more from the track, plain visibility is established and so far as that condition is concerned, the duty to stop arises. It is in practice a much simpler matter for the railroad to establish this to the satisfaction of the jury than to procure a finding which expressly convicts the motorist of negligence for failure to keep a proper lookout. It is also, as a practical matter, simpler to procure a a finding that the train was in hazardous proximity by reason of the physical facts, including speed of the respective vehicles, than to procure one that explicitly convicts the motorist of negligence for failure to appreciate the hazard. The jury will not unnaturally be tempted to say in many instances that there was not time enough for the motorist to appreciate it, although in fact there was a serious hazard.

Nor is there anything arbitrary about a statutory intent to give the railroad such advantage—or less of a disadvantage— as the more literal interpretation involves. The only effect is to put the duty upon the motorist to stop and thereafter not to start again until he can safely do so. Even if clear visibility and hazardous proximity were legislatively presumed at every crossing for the purpose of requiring motorists to stop, it would not be extreme. We have stop signs at hundreds of thousands of street intersections in the state, although automobiles can quickly start, stop and maneuver to avoid collisions with each other, while trains, with their physical limitations and the burden of carrying the public or its goods according to a schedule, cannot quickly stop or start and cannot maneuver at all. A halfway measure which imposes less than an absolute duty to stop, but which puts a greater duty on the motorist in this connection than existed before, is not in the least arbitrary as against motorists or in favor of railroads. In fact, as already stated, such a legislative purpose seems more likely than one which would say in effect that whenever a motorist would be negligent by not stopping, he must stop.

No doubt an important motive of the measure was to cause motorists to approach a track at a lower speed than is generally employed, which would be a natural thing in view of the relatively much greater difficulty of stopping a train in an emergency and the economic impracticability of making trains creep slowly through areas where there are crossings. The slower the motorist is moving, obviously the better his opportunity to see and avoid what is plainly visible and in hazardous proximity at one side. If the motorist has in mind that this situation may arise when he is within as little as fifty feet from the track,

imposing on him the duty to stop within the next thirty-five feet, he will or should approach crossings at lower speed than he would probably do otherwise. But under the theory of the court in the instant case, it is quite possible that the very speed of the motorist (and of the train) in a clear case of hazardous proximity will cause the jury to find that there was no duty to stop because the motorist in the exercise of reasonable care need not have seen the train within the very brief time in which it was exposed to his view.

One can readily imagine the case of both the motorist and the train approaching the crossing at high speeds. If there should be an obstruction to vision between them at any point, there will be little time left for the motorist to see the train as it passes the obstruction. If the question is, not whether there was an unobstructed view of the train, but whether the motorist in the exercise of due care should have seen it, certainly the jury is going to take into consideration the brevity of his opportunity to see it, even though he may have been two hundred feet from the track when vision first became unobstructed. The duty of stopping is thus rendered more uncertain and correspondingly of less concern to motorists.

The foregoing view does not entail agreement with the proposition that "hazardous proximity" is established as a matter of law whenever a collision occurs. I quite agree with the court that such is not the case. On the other hand, I do not think it is, or could be, argued that the incorrectness of that proposition entails also the incorrectness of my view of the statutory words in question. If the train were two miles off when the motorist attempted to cross the track without stopping but stalled and was hit, obviously there is no room for application of the statutory provision on any theory.

The Indiana decision, 221 Ind. 367, 47 N.E. 145, 146, upon which the court appears to place some reliance concerned a statute forbidding drivers of motor vehicles carrying explosive substances to "cross or drive upon the track or tracks of such railroad unless such person shall first bring such vehicle to a full stop, and, shall ascertain definitely that no train, car or engine is approaching such crossing and is in such close proximitty thereto as to create a hazard or danger of a collision." As the opinion observes, there was "no evidence that he (the driver) did or did not take the steps required by the above statute before driving upon the crossing" and that the defendants (railway company and others) "seek to invoke * * *

*res ipsa loquitur.* They assert that the collision could not have happened without a violation of the statute by the decedent and, therefore, that the fact of the occurrence conclusively established contributory negligence as a matter of law." The court rejected this contention and held that the issue of "contributory negligence was for determination of the jury."

The theory of the Court evidently was that the part of the statute requiring the driver to "ascertain definitely" that no train was approaching and in hazardous proximity constituted the crux of the case, and that such a provision should, for reasons of impracticality or perhaps unfairness, be in effect disregarded.

It seems to me that both the statute and facts in that case are importantly different from those here involved. In the first place the "ascertain definitely" duty is one which expressly relates both to the state of mind of the particular driver and the physical fact of the train's proximity. In our statute even the part dealing with starting up after stopping is in much less strict language, while the part requiring the motorist to stop has no express reference at all to the judgment of the driver.

In the second place, as the opinion of the court correctly states, we have before us only the question of failure to stop, as to which we hold that the jury finding of no failure to stop was not necessarily wrong. The impracticality of enforcing a provision like the "ascertain definitely" part of the Indiana statute is thus not a relevant consideration.

In brief, the Indiana decision supra, holds that the bare fact of the collision did not establish contributory negligence of the driver as a matter of law by reason of the statute. Such a holding is at best but argumentatively relevant to the instant case, and apparently the court so regards it.

The cited New Hampshire case of Gendron v. Glidden, 84 N.H. 162, 148 Atl. 465, while involving a street intersection accident between two automobiles, seems more in point. The statute there required a driver approaching an intersection to "grant the right of way, at the point of intersection, to vehicles approaching from his right; provided, that such vehicles are arriving at the point of intersection at approximately the same instant." Pub. Laws N.H. 1926, C. 90 Sec. 3.

The trial court instructed the jury in effect that if the southbound car reached the intersection first, the right of way rule otherwise favoring the eastbound car to its right had no application, and the question was merely one of due care. This was held to be error, because in the view of the appellate court the effect of such an interpretation would be to cause automobiles to race for crossings, an unlikely legislative purpose. It was added that the word "arriving at the point of intersection at approximately the same instant" meant "whenever there is such relative proximity of the vehicles to the intersection that, upon appraisal of all the factors in the situation, it would appear to the man of ordinary prudence in his place that there is danger of a collision if he fails to yield the right of way."

As our opinion points out, the court also held, regarding the eastbound (righthand) driver's claim for judgment as a matter of law, that "In short, the invocation of the statute raises an issue of fact in the first instance, namely, whether or not a man of reasonable prudence in the position of the person approaching from the less favored direction would reasonably have concluded that he could pass the intersection without danger of collision."

With all respect, the comparison of the words of the Legislature and the Court leaves one in some doubt as to whether the two speak English by the same rules. The net result appears to be that the statute accomplished nothing except to rewrite existing law in extraordinarily inadequate form.

Presumably our citation of this case will henceforth entail a corresponding construction of our own Art. 6701d, Secs. 71 (a) and 71 (b). Apparently our decision will also entail converting practically all of our elaborate rules of the road into simply a matter of due care on the part of the motorist concerned.

The cited Virginia case 187 Va. 181, 46 S.E. 2d 61, holds merely that a statutory traffic requirement to "first see that such movement can be made in safety" means, not that the driver in question was made an insurer of all consequences of his turn, but that, in effect, he had to use reasonable care under the circumstances. The statutory language is considerably milder than the "ascertain definitely" term in the Indiana case, 221 Ind. 367, 47 N.E. 2d 145, but the same distinctions from the present case apply. In the instant case, so far as the requirement to stop is concerned, the statute makes no express reference to the judgment of the driver. It particularly does *not* say that he shall "see that" he can omit to stop without serious risk

of collision; nor do the physical facts of plain visibility or dangerous proximity of the train, nor the duty to stop, make him an insurer of the consequences of a collision. The requirement to stop is not the same as liability for an accident. If he failed to stop because another car ran into him from behind, or for any of countless other good reasons, he is justified in his technical violation of the statute.

In any event, the authority represented by the foregoing cases and the two Indiana federal decisions which applied the Indiana law, while eminently respectable, has little weight in point of numbers, and conceivably may yet turn out to be a minority view as applied to statutes and situations like those now before us. It need not control us, if we think, as I do, that better reason points the other way.

Opinion delivered May 23, 1956.

Rehearing overruled July 25 ,1956.